For argument Alston v. Smith, Mr. Sillman. Good morning, Your Honors. May it please the Court, my name is Josh Sillman from Jones Day, and I represent Petitioner Eric Alston in this appeal. Your Honors, the undisputed facts on this appeal show that Mr. Alston's due process rights were violated by a dangerously high risk of judicial prejudgment in his probation revocation hearing. The key facts, considered in their totality, which are undisputed, are as follows. Law enforcement, Special Investigations Unit, or SIU, a high profile coalition of federal, state, local law enforcement agencies. Their representatives met privately with the administrative law judges that hear probation revocation hearings. They told them they had identified the 10 most serious, chronic, violent offenders in the community. That's undisputed. It's undisputed that they then, at this hearing, as the judge who decided Mr. Alston's hearing herself recounted, law enforcement instructed the judges that they should revoke probation upon any violation. Violation should be treated as sort of last straw, and it would be expected that probation would be revoked. It's also undisputed that at Mr. Alston's probation revocation hearing, ALJ Whitaker quickly recognized that Mr. Alston was one of the 10 individuals that she had previously been warned about by law enforcement in the private meeting with the ALJs. And she then candidly admitted on the record that this meeting with the administrative law judges would be relevant to her decision whether to revoke probation or whether to impose lesser measures. So what's wrong with that? Well, Your Honor, the due process clause forbids an objectively high risk of bias or prejudgment. And when exposure to facts of the case beforehand create that risk, there's a due process violation regardless of whether or not. Well, the meeting, they didn't discuss this case. They did not discuss the specific facts of Mr. Alston's case. But this was a meeting about 10 individuals. You know, every year, judges, before they're beyond too long, go for an educational spread in Washington. And they talk among other things with the FBI. Would that preclude any judge from sitting on a case in which the FBI had been under arrest? No, those facts would not, in my opinion. Those facts are a far cry from what we have here. Supposing they go more deeply into it and show how the FBI investigates carefully and does things like check to see whether they're doing the right thing and the judges participate. I think the key difference is here. No, no, just stay with me for a while. Why should, would they preclude themselves from that? No, I don't think in those facts. Supposing a judge hears a case, just like the one you got, and the verdict is guilty in his sentences. Is he now precluded from future cases where he's got the same factual situation involved? No, Your Honor. What's the difference? The difference between that case and this one is that here we're talking about 10 individuals. This is a meeting with one party. No, I'm talking about the same crime. He's got one of 15 cases involving the same thing. If there had been no discussion, and he hears the case, and there's a guilty, and he sentenced somebody, and there's a case just like it behind it, does he have to recuse himself? Involving a different individual in your hypothetical? Different defendant. Other than that, nothing has changed. No, he does not have to recuse himself. What's the difference? The difference is that he has not been exposed to facts. Yes, he has. Yes, he has. He's been exposed to the same facts. Exactly. That's why it's hypothetical. And, oh, I apologize, Your Honor. Different defendant. Different defendant in the same case. In that I agree. Same factual case. You will admit that it's possible that two crimes could be a month apart and be exactly the same, except for the defendant. Yes. OK, he hears one. Does that preclude him hearing the other? No. Why? The difference is that the judge is not coming to that case having been exposed to a private presentation from one of the parties in which the other party was not present and did not have the chance to reply. You're assuming that the people that gave this discussion are part of the thing. They are just people who teach. They are not a member of the government prosecution team that is trying this case. In this case, the SIU was a coalition of one. They're cops. Cops, right. And this was their representative. So the cops talked to the judges. That's correct. And these were the same organization. You consider that to preclude them from hearing any case involving what the cops told them? No, I do think it precludes them from hearing cases involving these 10 individuals. And that's. I got your point. Because he was at the same meeting, you mean? I'm sorry, Your Honor? The 10 individuals. Right. Were at the seminar, I guess. Is that right? I get confused about who was where. No, I'm sorry. The meeting with the judges before my client's private meeting between law enforcement and the judges who hear revocation cases, in which 10 individuals were discussed, not by name, but they were identified as the 10 worst, most chronic violent offenders. He wasn't there, obviously. No. OK. And my client obviously did not have a chance to have his own private meeting. But they were speaking in specifics, not hypotheticals. And your client happened to be one of the 10 most wanted or something or other. Exactly. This is not a blanket policy, standing alone. This is a law enforcement agency that is targeting 10 specific individuals, not unnamed individuals who might fit into some general category. They've identified them comparatively as the 10 most serious offenders in the community, and then instructed the judges that it would be expected that revocation should be revoked upon any violation. They would expect? They're telling the judges that they have to do this? Because that's what they expect. ALJ Whitaker, her recollection of this private meeting with law enforcement says, they said that the program was intended as a last chance. Violations should be treated, should, as a sort of last straw. It would be expected that they, the 10 individuals, wouldn't be given another chance. In other words, they, the 10, would be revoked. It's the defendants, not they, the judges. That's they, the defendants, not they, the judges. That's correct. It would be expected that the ALJs would revoke. So if the American Civil Liberties Union says they expect us to follow the law and keep people from having their constitutional rights violated, would that affect the judge? That would not, Your Honor. But that's not an instruction on how to rule on 10 individuals. At least I understand your position. Well, what would you do with this case? This is very common. George Mason University, they have programs for federal judges, frequent programs involving, for example, antitrust. And George Mason is very conservative. So they will feed the judges their conservative views  And that may influence the judges. Judges may have antitrust cases coming up or be in the middle of an antitrust case. But I don't think it's ever been suggested that they have to recuse themselves because they've been exposed to what may be a partisan view of a class of cases that does come before judges. Because after all, you can't prevent the judges from reading the Wall Street Journal. I don't know. Listening to Rush Limbaugh, right? There are judges who do that. Fair, Your Honor. They're all being contaminated by these influences of partisans, which includes law enforcement. Conceded, Your Honor? We never think the judges are forbidden to hear cases where they may have heard the issues, though not the specific case, discussed publicly. And I see I'm getting into my rebuttal time. But I will simply say that all of that is conceded, Your Honor. The key difference here is this is not an educational seminar about generally applicable policies. This is a meeting of 10 individuals with the judges. Education is very similar to brainwashing, right? I'm sorry? Education often verges into brainwashing, right? The educator wants to convince you of something. Maybe he wants to convince you that all Syrians are bad, right? We've seen it. This explains a lot, by the way. So we don't try to insulate the judges from being influenced by a whole variety of sources, including the prosecutors, obviously. But we do try to insulate them from being exposed to representatives of one of the parties trying to influence the judge how to rule in a specific case or a case. What do you mean by representative of one of the parties? The Justice Department represents the government in all these cases. But the Justice Department is not permitted to hold meetings with judges in which they tell them their concerns about crime and this and that and the other thing? They are permitted to do that under Your Honor's hypothetical, but that's very different from what happened here. Instructing the judges how to rule in 10 individuals' cases. Pardon? That's very different from what happened here, which is a private meeting instructing the judges how to rule in 10 individuals' cases. This is not. So you're saying they recited 10 examples, we'll call it, of people who should be given, that's their last chance. Is that right? That's right. They said one of the 10 that they only recited the facts, not the name, I guess. Was your client. No, Your Honor. The record does not reflect that the facts of any particular individual's case was discussed here. What was discussed was that the law enforcement group had identified the 10 worst individuals on probation and then first presented these individuals' cases in terms of this toxic first impression and then instructed the judges that revocation would be expected for any violation. And that's what occurred here. Let me see if you can agree with me that judges are presumed to set aside things that they shouldn't be considering when they're hearing a case. That presumption exists, does it not? So that that's the reason why in bench trials, the rule of hearsay is not as firmly adhered to in terms of objections. He overrules the objection or sustains it, but he still heard it. But it's presumed that he doesn't pay attention to it, right? What's the difference in that and what you've described? I'm sorry, Your Honor, I lost the thread. What I'm saying is judges are presumed not to consider things that they shouldn't consider, which would be somebody telling them how they should rule or what is expected of them by the government. Correct. There is that presumption, and A.L.J. Whitaker said that she would be unbiased here. I urge this court to look at the totality of the facts, and those facts overcome the presumption. Importantly, we're not interested in whether A.L.J. Whitaker subjectively was biased or whether she got the right result in this case or whether she did a good job or wrote a good opinion. Completely irrelevant. We're considering the facts objectively in their totality. Is there a high objective risk of prejudgment or bias? Is there a risk that she's going to potentially afford more weight to this private meeting with law enforcement than she would to the actual evidence presented at the hearing? And this is, of course, why ex parte communications are frowned upon and why they can, in certain cases, violate due process. I see my time is up. With the court's indulgence, I would take some time for rebuttal. Yeah, no, that's fine. We'll do that. I appreciate it. Thank you, Your Honor. Thank you, Mr. Stone. Mr. O'Brien. May it please the court. Thank you. This court must presume, as Withrow v. Larkin teaches, that Judge Whitaker acted with honesty and integrity, that she would so act and did so act. The petitioner has failed to overcome that presumption because, in the words of Caperton v. Massey Coal Company, he has failed to prove that this is that rare exceptional case with, quote, extreme facts that create a, quote, serious risk of actual bias. With regard to this particular case, Mr. Alston has failed to prove that Judge Whitaker, there was a serious risk that Judge Whitaker would abdicate her duty to consider the evidence presented before her, to determine the facts, and to independently exercise her discretion. He failed to prove that her attendance at a seminar that occurred five months before this hearing, before Mr. Alston even violated, before there was any case pending regarding Mr. Alston. So it is wrong for counsel to refer to this as an ex parte communication because there was nothing pending regarding Mr. Alston. There was no mention of Mr. Alston. This was to discuss the program that these agents, rather these administrative law judges, are going to necessarily learn about because they're considering revocation hearings. And this obviously is highly relevant to revocation hearings. This program put people in intensive social services and treatment, which obviously their probation and parole agents are going to have to learn about and work with these people. They're going to have to understand how this works, how this program works. So then the administrative law judge who presides over a revocation proceeding is going to have to understand, well, what is this all about? So hence, an informational seminar. Call it a private meeting. I think the Wisconsin Court of Appeals was more correct that this was akin to seminars that judges attend about new developments in the law, new sentencing guidelines, new legislation. And yes, this was a specific program. And yes, Mr. Alston was one of the original participants. But again, that was not mentioned. And yes, I will concede that they did recommend. The officers who presented, I believe there were two Madison police officers, highly recommended in the words of Judge Whitaker, highly recommended revocation assuming that violations are actually proven for those who are in this program because it is a last chance that these are people with a long history of criminal violations. To anybody that law enforcement recommends sentencing. I'm sorry? It shouldn't be a shock to anybody that law enforcement recommends that defendants be sentenced to jail if they're convicted. No, it shouldn't be in any sentencing hearing. You're going to have prosecutors, law enforcement officers, victims, victims' families, recommending the maximum. The judge still has to exercise discretion. And I think one important point here, I've cited in my brief the civil case that Mr. Alston brought against the city of Madison regarding this program. And the findings in that case specifically show it was on a summary judgment motion. But the records in that case said, with regard to this program, that administrative law judges retain the discretion invested in them by law. And obviously, under Wisconsin law, Judge Whitaker had to independently exercise discretion. She couldn't just blindly accept someone's recommendation for revocation without making an independent determination based on the facts that that recommendation makes sense. She was free to say, I know these officers in the SIU  should always be revoked. But this case doesn't present those facts. Are these ALJs all specialists in this area? Are they part of the special innovation? No, they are not part of it. They are a separate state agency. As an ALJ, I was sort of curious about this anyway, they are administrative law judges of some kind. That's the way I call them, ALJs. And I wonder if this is their specialty. We have ALJs for Social Security, and we have sometimes for immigration. I'm just curious, are these specialists? Yes, they're specialists. They're part of the Wisconsin Department of Hearings and Appeals, which is part of the large Wisconsin Department of Administration, which is separate from the Department of Corrections, which actually initiates the revocation proceedings. Is this all they do? And this is all they do. And it's not just revocation proceedings. It can be in other civil matters involving administrative review. It's all administrative review, basically. And so the case is just like a regular circuit judge. OK, these are lawyers, I assume. I'm sorry. Yes, they have to be lawyers. OK. But that's what I'm saying. They're specialists for this purpose. And obviously, this is a recurring problem in revoking probation. And it's huge. We have a lot of problems then. And usually, there are, we'll call them, probation officers assigned to certain people. They have a bunch of them. And so I don't know where they fit in. But they're trying to keep these people in line. They're not the ALJs. And also, I think. So you have a whole system of probation, supervised release, and people that are out and not behaving. So these are 10 worst behaving examples, which apparently coincide with, what's his name, Mr. Alston. What's his name? Alston, yes. Alston, yeah. Yes, and furthermore, the SIU, the law enforcement agencies that were involved with this, simply could not, by law, dictate revocation. That would violate Wisconsin law. And the judges know that. They know that they have to follow certain procedures, that the case law sets out very specific criteria they must follow when exercising discretion. As Morrissey v. Brewer requires an informal hearing with sufficient record to enable the judge to properly exercise discretion, Wisconsin, the Plotkin case I cited, has very specific requirements. And these judges know that they're required to follow those requirements, regardless of what anyone recommends, or regardless how strongly anyone recommends, for or against revocation. And that really is what comes down here, too. There's no question that Whitaker would have found out about his participation in this program at the April 2012 revocation hearing. The fact that she found out about it at this general presentation five months earlier, but not knowing at that time that he was involved in this, in learning for the first time at the April hearing, but she would have, because that would have been relevant. Obviously, his participation and his unsuccessful participation in that program would be highly relevant to A, her decision whether he committed violations, and if so, B, whether he should be revoked. So to that extent, her knowledge of his participation in this program was relevant to her decision. But that doesn't make it biased. That doesn't make it hopelessly tainted. It was based on the independent evidence. And her decision, I think, is the proof in the pudding that her thorough decision shows that she considered many facts before her, made detailed factual determinations that there were violations, and then thoroughly considered alternatives to revocation before independently exercising a discretion in favor of revocation, even going so far as to say, you know, I did consider alternatives. And in this case, there might have been alternatives if he would only admit that he committed these violations, that the factual record clearly shows he did commit. But he won't. And he has this history. And therefore, my only alternative is revocation. That was not tainted by any impropriety. And Mr. Olson has utterly failed to overcome the strong presumption that she acted impartially. OK, thank you, Mr. O'Brien. So Mr. Stillman, you have the floor. Thank you, Your Honors. You may be seated. A few points in response. There's no question that under Wisconsin law, the ALJs retain discretion. And the whole reason that we have ALJs make this decision, rather than the probation officer himself, is that we have an independent, neutral, and detached party making these decisions. So it's no answer to say that, as some formal legal matter of Wisconsin law allows ALJ Whitaker to have discretion, nor does due process require Mr. Olson to show that she would necessarily follow the instructions that were given to her at the private meeting. All Mr. Olson has to show is a risk, considered objectively, of bias and prejudgment. Not actual bias, not actual prejudgment. Moreover, harmless error analysis is like these. So it's no answer to say the judge did a good job, she set aside this hearing. The question is, considered objectively, do the facts in their totality present a high risk of bias and prejudgment? What is it you think influenced her? The fact that this committee had identified the defendant as one of the 10 worst probationers, what have you? Or what she learned about what was said at the meeting? The meeting itself, the influence, regardless of its content, just learning that this committee had pronounced these the 10 worst, is that what influenced her? What she heard about what was said at the meeting? Two things, Your Honor. It's both the content and the form in which this information was delivered. Before a new, in a new hearing before an impartial judge, the SIU will be free to say, we've identified him, we don't like him, he's one of the worst, please revoke. That's undisputed. What they're not free to do is meet with the judge ahead of time, instruct them how to rule, say they've identified the 10 worst, thus creating a toxic first impression of 10 individuals. And then the judge then candidly admits that this, what that presentation was about is going to be relevant to what part of the decision. I understand your form argument. I understand the content. Why can't a committee of prosecutors or what have you identify, you know, like the most wanted criminal postings in post offices? Why can't they do that? And if a judge sees it, well, it's some information. What's wrong with that? That's right. I'm telling to a committee of prosecutors, whatever you guys want, I'll do. That would obviously be, that would be very different from just, yeah, you discuss these people and, you know, we learn from it. Well, this is very different than a mere exposure to a most wanted list or something like that. The key is that the due process clause requires considering all of the facts in their totality, not in isolation. Well, that's what for the judge to do. But the judge can learn some of these facts from groups that are not, you know, not judicious or anything like that, right? The judge. They're constantly doing that. I'm sorry? They're constantly doing that. As I said, when they go to these conferences sponsored by a lot of universities, a lot of law schools have programs for judges. Right. So. And your honor, I think, and this is a rationale that the Wisconsin Court of Appeals relied on. And it's wrong, objectively unreasonable, because this is far more prejudicial than a standard issue educational seminar. 10 individuals, private meeting, law enforcement, and the judges who will hear their cases. Painting them as the 10 worst, instructing them how to rule in those cases. That's not the kind of educational seminar that judges are regularly attending. I don't think you mean instructing them how to rule. That sounds like an order. As ALJ Whitaker recalled what she heard at that meeting, they said that probation should be revoked. That's advice. It's not instruction in the sense of an order. It's certainly not an order. They said probation should be revoked upon any violation. It would be expected that probation would be revoked upon any violation. One last factual point, your honor. The state court record is unclear as to when this meeting occurred. And according to the state court record, potentially sometime before Mr. Elson was in custody, in his companion civil rights case in discovery, the SIU has admitted that this meeting actually occurred when he was in custody on the same day that his probation revocation proceedings were initiated. We, of course, don't know the time of day. It's not in the state court record. It can only be considered because EDPA deference does not apply here for numerous reasons that I outline in detail in my brief, some of which respondent does not apply to the substance of. So EDPA deference does not apply here. And there's no dispute from respondent that the date has now been admitted and that judicial notice could be appropriate. You were appointed, were you not? I was. Thank you very much. Thank you very much. OK, well, thank you to both counsels.